**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **YVETTE AGUILAR,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.: 2:21-cv-105** |
| | § | |
| **CITY OF CORPUS CHRISTI,** | § | **JURY DEMANDED** |
| *Defendant.* | § | |
| | § | |
| | § | |

_____

**PLAINTIFF'S ORIGINAL COMPLAINT**
_____

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

NOW COMES Plaintiff Yvette Aguilar (hereinafter referred to as "Plaintiff") in the above-referenced matter, complaining of and about Defendant City of Corpus Christi (hereinafter referred to as "Corpus" or "Defendant"), and for causes of action files this Original Complaint, showing to the Court the following:

### I.  PARTIES

1.      Plaintiff is an individual residing in Corpus Christi, Nueces County, Texas. Plaintiff is a citizen of the United States and the State of Texas.

2.      Defendant is a Government entity, organized and existing under the laws of the State of Texas and having offices and its principal place of business at Mayor Paulette M. Guajardo, Corpus Christi City Hall, 1201 Leopard St, Corpus Christi, TX 78401.

### II.  JURISDICTION

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's causes of action arise under federal statutes: Title VII of the Civil Rights Act of 1964 (as amended) (which

*Plaintiff's Original Complaint*

is codified in 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a)) (hereinafter referred to as "Title VII") and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

4.      Venue is proper in the Southern District of Texas - Corpus Christi Division pursuant to 28 U.S.C. § 1391(a) because this is the judicial district where the Defendant's principal place of business exists.

### III.  <u>NATURE OF THE ACTION</u>

5.      This is an action brought pursuant to Title VII to correct and recover for Defendant's unlawful racial discrimination and retaliation, as well as First Amendment Retaliation and to deter Defendant from continuing its unlawful and discriminatory employment practices.

### IV.  <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

6.      On September 4, 2020, Plaintiff filed a Charge of Discrimination (Charge No. 460-2016-00727) with the U.S. Equal Employment Opportunity Commission (hereinafter referred to as the "EEOC") and the Texas Workforce Commission (hereinafter referred to as the "TWC") against Defendant for race discrimination, sex discrimination, retaliation and First Amendment Retaliation.  Attached as Exhibit A.

7.      Subsequently, the EEOC issued Plaintiff a Notice of Right to Sue, dated February 25, 2021.  Plaintiff files this lawsuit within ninety (90) days of receiving the Right to Sue notices. Attached as Exhibit B. Therefore, this lawsuit is timely filed.

### V.  <u>FACTS</u>

8.      Plaintiff was hired by Defendant on July 19, 2004 as a Prosecutor.

9.      Ms. Aguilar began her career with The City of Corpus Christi as the Juvenile Prosecutor (Attorney I, in the City's Legal Department) for the Corpus Christi Municipal Juvenile

Court. During her tenure, she received promotions, spectacular praises, and performance appraisals.

10.     In 2007, she requested to be transferred to an administrative attorney position at City Hall and that request was granted.

11.     In 2009, she filed a complaint with the Human Resources Director, against then City Attorney, Mary Kay Fischer for retaliation. Ms. Fischer was terminated by the City and a subsequent investigation, determined that she was indeed retaliated against by Mary Kay Fischer, however, Ms. Aguilar chose not to sue the City.

12.     Mr. Carlos Valdez was hired as the next City Attorney, and on August 3, 2009, he promoted Ms. Aguilar to Chief Prosecutor of the Municipal Court. Ms. Aguilar served as Chief Prosecutor for several years without a raise due to the City's budget constraints.

13.     On July 14, 2014, after a performance review of the City's Legal Department, and upon the recommendation of Interim City Attorney, Barney Knight, Ms. Aguilar was promoted to an Attorney III. She continued to serve as the Chief Prosecutor for the Municipal Court, lead the Legal Department's Internship program, and was periodically an instructor at the Police Academy.

14.     Ms. Aguilar had issues with the two prosecutors that continued throughout May and June of 2015. She reported all the complaints to City Attorney Mr. Miles Risley and communicated other issues directly with him.

15.     On May 20, 2015, she had a meeting with Mr. Risley, Assistant City Attorneys Lisa Aguilar, Buck Brice, and contract attorney Angela Deluca regarding roles at the Prosecutors' Office. A week later, on May 27th, she met with City Attorney, Mr. Risley again regarding issues with Angela Deluca. Mr. Risley stated he was thinking of sending Ms. Deluca back to City Hall and making it _clear to young attorneys that they do not get to choose their supervisors_.

16.     On June 8, 2015, Ms. Aguilar sent a memo to City Attorney Miles Risley regarding threats to her employment. That same morning, she met with Sylvia Guzman in Human Resources regarding the complaints made by the two prosecutors. In the afternoon, she met with assistant Chief of Police, Mark Schauer regarding corruption involving City Attorney Miles Risley, Municipal Court Judges and Council members.

17.     On June 11, 2015, only 3 days after her protected complaint, Miles Risley informed her she was being removed as Chief Prosecutor and being assigned as a nonsupervisory assistant city attorney at City Hall.

18.     On June 23, 2015, Ms. Aguilar met with her supervisor, Buck Brice, to discuss a grievance related to changes in work conditions and issues with her wages. She was informed on June 24, 2015, that a vendor for the Municipal Court software made a complaint to the Municipal Court Director, that the Presiding Judge was bragging about getting rid of personnel at the Municipal Court and that the City Attorney was helping. Ms. Aguilar then reported this information to Assistant City Manager Margie Rose and Assistant Chief Schauer and asked for an independent investigation on this allegation.

19.     On June 30, 2015, Ms. Aguilar officially filed a written grievance regarding gender inequality and pay inequity and gave it to Mr. Brice. Mr. Brice provided his written response to her grievance on July 7, 2015.

20.     Ms. Aguilar had several meetings from July through October of 2015 regarding her grievance. The findings she received included her removal as Chief Prosecutor was upheld; grievance based on gender inequality was denied; and there was a finding of pay inequity to which she was given a small raise with back pay.

21.     From the time she was transferred to City Hall, she was given large amounts of work and although she requested assistance, those requests were ignored or denied. Despite being a single mother, having to work long hours and juggle large amounts of time sensitive work, she again excelled in the performance of her duties. Ms. Aguilar received performance evaluations that indicated she greatly exceeded expectations in her work. Despite her many achievements, Mr. Risley never acknowledged her successes for the department. He referred to her as a "Pitbull," even after she informed her supervisors that she felt that was meant as a derogatory term.

22.     When complying with her responsibilities, Ms. Aguilar had a meeting with attorney Lilia Castro, when Ms. Castro was displeased, there was immediate action to hold a meeting with Ms. Castro and her supervisors. Mr. Risley attended the meeting. During the meeting, Ms. Castro was allowed to insult and yell at Ms. Aguilar, calling her the worst City Attorney in the entire department, with no interception by any of the supervisors in the room. After the meeting, Ms. Aguilar emailed Mr. Brice and Mr. Risley to complain of her hostile work environment. No response or action was taken by Mr. Risley or Mr. Brice in regard to the complaint.

23.     The hostile work environment continued for Ms. Aguilar. Her private and personal information relating to payroll issues, health issues, and work conditions was circulated around the office by Mr. Risley or someone who had access to Mr. Risley's email. When she complained about Mr. Risley in April 2017 to City Manager Margie Rose, an investigation was conducted by HR, Sheri Eldridge. Ms. Eldridge also asked Ms. Aguilar for other complaints she had against Mr. Risley. She informed Ms. Eldridge of the fact that Mr. Risley ignores complaints made by her but if employees complain about her, he addresses those concerns immediately, unfair distribution of workload and being referred to as a dog by Mr. Risley. The investigation into the circulation of the email containing her confidential information was completed around June 2017. However, no

one contacted her to go over the findings. Ms. Aguilar had to contact HR and the City Manager multiple times to receive a response. It was not until August 4, 2017, that Ms. Rose finally met with her to go over the findings of the investigation. Ms. Aguilar did not receive anything in writing regarding the investigation that took place. She was simply told by Ms. Rose the findings were **inconclusive**. No information was provided to Ms. Aguilar regarding the additional complaints she made against Mr. Risley.

24.     On August 8, 2017, Ms. Aguilar was preparing to go on FMLA for surgery. She emailed Mr. Risley and Mr. Brice regarding her workload and coverage of her duties while she was out on leave. This email went unanswered however, there was a meeting held by Mr. Risley and Mr. Brice, where Mr. Risley questioned why Ms. Aguilar filed complaints against Mr. Risley and other employees with Human Resources instead of him. Mr. Risley also informed Ms. Aguilar that HR had informed him that none of her complaints against him were valid, except for the complaint that he did not commend her on being the first attorney in the State of Texas to get awarded a previous determination from the Attorney General. Ms. Aguilar again filed a complaint of continued hostile work environment and requested an outside investigation to Ms. Rose, who is Mr. Risley's direct supervisor. Ms. Rose referred her complaints to ACM Sylvia Carillo regarding Mr. Risley.

25.     From August 22, 2017 to September 5, 2017 Ms. Aguilar was on FMLA. On her first day back at work, Buck Brice informed her that Miles Risley decided to move her back to Municipal Court to be the Environmental Court prosecutor and also continue to give legal advice to Code Enforcement effective September 11, 2017. That same afternoon, Ms. Aguilar emailed City Manager Margie Rose that she believed she was being moved in retaliation for making complaints against Miles Risley. This was reported in accordance with the city policy on reporting

retaliation. Margie Rose responded, and stated Ms. Aguilar needed to contact HR to investigate her claims. HR Director, Steve Viera was copied on her email however HR never responded or addressed her retaliation complaints.

26.     From 2017 through 2020, despite being the most senior and experienced attorney at the Prosecutors' Office, Ms. Aguilar was not reassigned as the Chief Prosecutor, however, a white, male, lower-ranked Attorney I, was named the "Lead Prosecutor." Throughout her time at Municipal Court, Ms. Aguilar handled all City Ordinance violations dockets continually increasing with no assistance, continued providing legal advice to Code Enforcement, and reviewing Building Standards Board cases and handled Building Standards Board appeals to City Council; and was often consulted for legal advice from the Lead Prosecutor and from Buck Brice as it related to Municipal Court and criminal cases in Municipal Court.

27.     On January 2, 2020, Ms. Aguilar had a meeting with her supervisor, Buck Brice, to go over her evaluation. She told Mr. Brice the evaluation was improper as it did not cover all of her duties. The evaluation did not evaluate her performance as a legal advisor to Code Enforcement and rated her as just meeting the City's expectations rather than exceeding the City's high expectations, which contrasted with the previous years' evaluations. Ms. Aguilar refused to sign the evaluation and advised Mr. Brice she would be filing a rebuttal, prior to signing the evaluation. This improper evaluation effected the amount of merit increase she would receive for that year. A couple of weeks later she discussed with Mr. Brice the fact that her role had changed, and she was serving more as a trainer/mentor to the new prosecutors since there was no supervisor physically present in the office and notified him that something needed to change, especially since she was not being compensated for these additional duties. Mr. Brice said he would decide if he thought anything needed to change.

28.     In late January 2020, Ms. Aguilar filed an open records request for salaries for attorneys officed in the Legal Department. The Legal Department did not fully respond to her request. They withheld a portion of the requested information without seeking an Attorney General ruling, and Ms. Aguilar had to file a complaint with the Open Records Division of the Attorney General 's Office. After the Legal Department finally released all the information related to attorney salaries previously requested by Ms. Aguilar, on March 13, 2020, she filed a grievance regarding her wages to her supervisor, Mr. Brice.

29.     On March 15, 2020, Ms. Aguilar contacted Mr. Brice advise that she would be going to the doctor to get checked out due to coronavirus-like symptoms the following day out of an abundance of caution and per the instruction of staff of the Nueces County Health Department.

30.     She contacted Mr. Brice again on March 16th, to advise that she had been diagnosed with an ear infection and requested permission to return to work. Mr. Brice said that the City Manager was working on a travel policy due to the coronavirus and that it was possible she would have to quarantine due to her son being out of the country recently.

31.     Mr. Brice and Mr. Risley contacted Ms. Aguilar at about 6:30 pm that same evening and after a series of questions, Mr. Risley told her that the City Manager had not signed off on a travel policy and that it might come out the next day and instructed her that she would have to take sick leave for time missed from work due to her illness and thereafter she would have to work from home.

32.     On March 17, 2020, Ms. Aguilar received a copy of the City Manager's travel policy related to the coronavirus that was circulated to Municipal Court employees. The policy stated it was effective immediately and showed that department directors had received the policy at approximately 5:30 pm on March 16, 2020. The policy clearly stated that employees would not

have to use their own time for work missed due to coronavirus related illness/travel and that if it was not feasible for an employee to work from home the employee would receive paid administrative leave.

33.     The only computer in Ms. Aguilar's home was old, did not have Microsoft office and was located in her son's room, who she was required to stay 6ft apart from due to CDC quarantine instructions. Ms. Aguilar raised these issues with Mr. Brice but he did not respond to her questions about the feasibility of working from home during quarantine. She then requested clarification from the Interim HR director, who also failed to respond to her request for clarification. In that same email to the Interim HR director, Ms. Aguilar stated she believed that she was being retaliated against by Mr. Risley, due to reporting inadequate staffing and supervision of the Prosecutors' Office and due to her filing a grievance related to her wages. Ms. Aguilar was not being treated the same as other City employees and that this may also be related to her race, as a Caucasian female attorney was going to have to quarantine per the travel policy and Buck Brice instructed the prosecutors that City Hall would need help covering her workload due to the Caucasian female attorney having to quarantine, even though that attorney had a laptop and should have been able to work from home.

34.     On March 27, 2020 Mr. Risley advised Ms. Aguilar that her rate of pay is not subject to grievance procedure and that he would not treat this as a grievable issue. Ms. Aguilar returned to work, after quarantine on March 30, 2020. After a few back-and-forth emails, On April 1, 2020 she met with Mr. Brice and Mr. Risley regarding her grievance and requested a pay increase. To this day, she has not received a response.

35.     Shortly after she returned to work, Mr. Brice advised that prosecutors who were not working from home would have to email him a daily list of completed tasks. Although the

Municipal Court had been closed to the public since March 16, 2020, and the other two, Caucasian female prosecutors had been working in the office daily, Mr. Brice did not require them to submit to him a daily list of completed tasks. By the end of March, the other two prosecutors were mostly working from home, while Ms. Aguilar volunteered to work daily in the office. One of the prosecutors, who is a Caucasian female, that was working from home, due to her weakened immune system and age was not being given assignments as rigorously as Ms. Aguilar was given when she was forced to work from home during her mandatory quarantine. In fact, one of the other prosecutors in the office mentioned that it seemed as though this Caucasian prosecutor was being given preferential treatment, especially when compared with the work assignments Ms. Aguilar was given when working from home.

36.     On April 4, 2020, in response to a potential violation of the Mayor's Stay at Home Orders by a co-worker, the upcoming Easter holiday, and postings of violations of the Stay-at-Home Order, Ms. Aguilar had seen on Facebook, she shared a post on her personal Facebook page. The post was regarding compliance with Stay-at-Home Orders and added comments voicing her agreement with the post and included activities that put people at risk of contracting the coronavirus. These were general statements that did not identify any individuals or their health conditions and statements that many employees and individuals were facing daily in their lives. Even though the prosecutor who was working from home due to her weakened immune system is not friends with Ms. Aguilar on Facebook, somehow, she became aware of her post and made a complaint against her.

37.     Buck Brice contacted Ms. Aguilar on Monday, April 6, 2020, and questioned her about the date and time of her post and the reason for the post. When Ms. Aguilar responded that she posted the information because she had a first amendment right to free speech, he stated the

post was made during work hours and stated since the prosecutor made a complaint, he had to investigate it. This is another example of a Caucasian employee making a complaint against Ms. Aguilar and investigation being initiated immediately, yet when she made complaints about a Caucasian employee cussing at her, no investigation was started. Additionally, when she complained that a Caucasian (non-minority), male supervisor was not providing adequate supervision, no investigation was initiated.

38.     Throughout her nearly sixteen-year career with the City, she has demonstrated a tremendous work ethic, zealously advocated for her client departments, and she is a highly skilled trial attorney. She has been promoted by every City Attorney prior to the hiring of Mr. Risley and is the only nonsupervisory attorney under the City's Legal Department budget that has not been given a wage increase since 2015 aside from her annual merit increase. She continues to deal with a hostile work environment and is treated disparately compared to other employees in the Legal Department.

**VI.     CAUSES OF ACTION**
**COUNT 1**
**RACE DISCRIMINATION**
**PURSUANT TO TITLE VII**

39.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

40.     Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her race.

41.     Ms. Aguilar is a Hispanic woman which, in the situation described above and for the purposes of Title VII, makes her a member of a protected class.

42.     She is qualified for her position as she has demonstrated and had been promoted based on her work performance.

43.     City Attorney Miles Risley began discriminating and retaliating against Ms. Aguilar since June of 2015 after making complaints of her hostile work environment and participating in a corruption investigation where Mr. Risley was believed to be involved.

44.     Ms. Aguilar has been treated disparately than her Caucasian counterparts and has had her complaints ignored by Defendant. Her pay has also suffered due to the discrimination and retaliation by Defendant.

45.     No action was ever taken by Defendant to remedy or stop the harassing behavior towards Plaintiff.

46.     Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status because of Plaintiff's race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

### COUNT 2
### RACE DISCRIMINATION
### PURSUANT TO § 1981

47.     Plaintiff hereby incorporates by reference all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

48.     Defendant intentionally engaged in unlawful discriminatory practices against Plaintiff because of her race.

49.     Ms. Aguilar's complaints were not treated as her Caucasian counterparts' complaints were. She was also denied benefits that Caucasian attorneys who worked for Defendant enjoyed.

50.     Defendant discriminated against Plaintiff in connection with the compensation,

terms, conditions, and privileges of employment, or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect Plaintiff's employment status because of Plaintiff's race, in violation of 42 U.S.C. § 1981.

## COUNT 3
## RETALIATION PURSUANT TO TITLE VII

51.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

52.     Defendant intentionally retaliated against Plaintiff because of the complaints of racial discrimination and retaliation made to Defendant in violation of Title VII.

## COUNT 4
## FIRST AMENDMENT RETALIATION (42 U.S.C.§1983)

53.     Plaintiff reasserts and incorporates by reference all of the above numbered paragraphs.

54.     Plaintiff asserts she has suffered retaliation due to speech protected by the First Amendment.   Specifically, Plaintiff contends 1) that the Plaintiff engaged in speech involving a matter of public concern when she posted on her Facebook page regarding the Stay-at-Home orders, (2) that Plaintiff suffered an adverse employment action for exercising her First Amendment rights, and (3) that the employee's exercise of free speech was a substantial or motivating factor in the adverse employment action. When Plaintiff underwent an investigation regarding the post and was treated as if she posted on Facebook during working hours.

## XII.  JURY DEMAND

55.     Plaintiff demands a jury on all issues to be tried in this matter. Plaintiff submits the jury demand and herein submits the jury fee.

### XIII.  <u>PRAYER</u>

56.     WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

  a.     All damages to which Plaintiff may be entitled pursuant to this Original Complaint;

  b.     Compensatory damages, including, but not limited to, emotional distress;

  c.     Past, present, and future physical pain and mental suffering;

  d.     Punitive damages;

  e.     Reasonable attorneys' fees, as allowed by law (with conditional awards in the event of appeal);

  f.     Pre-judgment interest at the highest rate permitted by law;

  g.     Post-judgment interest from the judgment until paid at the highest rate permitted by law;

  h.     Costs of Court; and

  i.     Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any proper amendments thereto.

Respectfully submitted,



Alfonso Kennard, Jr.
Texas Bar No.: 24036888
Southern District No: 713316
5120 Woodway Dr., Suite 10010
Houston, TX  77056
Telephone No.: (713) 742-0900
Facsimile No.: (832) 558-9412
Alfonso.Kennard@kennardlaw.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**


**OF COUNSEL FOR PLAINTIFF:**



Cristabel Jimenez
Texas Bar No. 34096165
Southern District No. 3644269
5120 Woodway Dr., Suite 10010
Houston, TX  77056
Telephone No.: (713) 742-0900
Facsimile No.: (832) 558-9412
Cristabel.jimenez@kennardlaw.com